**Clint PINDER and Dorothy Pinder, d/b/a Clint Pinder Seafood Company, Plaintiffs-Appellants,**

v.

**HUDGINS FISH COMPANY, INC., Defendant-Appellee.**

**No. 75–4321.**

United States Court of Appeals, Fifth Circuit.

April 4, 1978.

---

Herbert T. Schwartz, Gainesville, Fla., David S. Dearing, Tallahassee, Fla., for plaintiffs-appellants.

Hubert R. Lindsey, West Palm Beach, Fla., for defendant-appellee.

Before BROWN, Chief Judge, AINSWORTH, Circuit Judge, and JAMESON *, District Judge.

JOHN R. BROWN, Chief Judge:

Plaintiffs-appellants Clint Pinder and Dorothy Pinder filed suit against Hudgins Fish Company, Inc., alleging violations of Sherman Act, Sections One and Two, 15 U.S.C.A. §§ 1–2, and praying for damages under 15 U.S.C.A. § 15. After a three-week trial, a jury returned a general verdict [1] for

---

\* Senior District Judge from the State of Montana, sitting by designation.

1. It is unfortunate that the Court did not use special verdicts under F.R.Civ.P. 49(a), to dis-

tinguish between Section One and Section Two and to have the damage issue framed separately, as well. As it is, these crucial issues are lumped together in an enigma wrapped in a mystery of a general verdict, with no clues as

Hudgins. The Pinders filed a motion to set aside the jury verdict and enter judgment n. o. v. as to liability, and for a new trial on the issue of damages, or, alternatively, for a new trial on both liability and damages. The District Court denied the Pinders' motion, and they have appealed from that denial. Under the standard of review set forth in this Court's *en banc* decision in *Boeing Co. v. Shipman,* 5 Cir., 1969, 411 F.2d 365, we affirm.

### General Characteristics Of The Food Fish Industry

#### Going Fishin'

Some general facts concerning the market structure in the commercial food fish industry in Florida are helpful in understanding this case. Fish have two salient features which leave an indelible mark upon the structure of the food fish industry in Florida. First, they migrate during seasonal runs. The natural result of this is that fish production is much heavier during seasonal runs than at other times, since the fish are much more concentrated during these runs. Another result is that the fisherman must generally follow the fish, even when this takes the fisherman out of his home waters.

The second characteristic of fish important to the food fish industry is that fish spoil very rapidly if not refrigerated or frozen. This piscean characteristic creates an overwhelming need for fish processing, refrigeration, or storage facilities within a few hours of the catch.

During the time[2] and in the five county area of the lower east coast of Florida[3]

delineated in plaintiff's complaint, there were hundreds of commercial fishermen. Historically, each fisherman owned his own boat, nets, and lines, and could fish when, where, and for whom he wanted. Occasionally, however, dealers financed the boats and equipment for certain fisherman, and this created ties between fishermen and dealers. Friendships and price differentials among different dealers undoubtedly fostered other ties between fishermen and dealers. However, these ties were generally ignored during the fish runs. Then the fishermen usually followed the fish wherever they went, and, in order to prevent spoilage, took their catch to the nearest refrigeration and freezer plant that would take the fish, regardless of who operated the plant.

Dealers are the next step in the food production chain. The Pinders and Hudgins were among nine or ten fish dealers who operated along the lower east coast of Florida between April 1971 and June 1973. The dealers all owned refrigeration facilities, and Hudgins owned, in addition, freezer facilities. The main function of the dealers is to purchase fish from the commercial fishermen and to sell them to various wholesale and retail markets. Dealers generally buy fish at their fish house or "over-the-wall."[4]

After processing the fish, the dealers could either pack and sell the fish fresh, or freeze it to sell later. The major wholesale fresh fish market used by the Florida dealers at this time was the Fulton Fish Market in New York City. Fresh fish were also sold, however, to markets in Philadelphia, Boston, Jacksonville, Miami, and other cities

---

to the jury's basis for its verdict. With special verdicts available, we encourage their full use. *See* J. Brown, Federal Special Verdicts: The Doubt Eliminator, 44 F.R.D. 338 (1967); *Wolfe v. Virusky,* 5 Cir., 1972, 470 F.2d 831, 837 (Brown, C. J., concurring); *In re Double D Dredging Co.,* 5 Cir., 1972, 467 F.2d 468, 469 n. 3; *Thrash v. O'Donnell,* 5 Cir., 1971, 448 F.2d 886, 889–92; *Little v. Bankers Life & Casualty Co.,* 5 Cir., 1970, 426 F.2d 509, 512 (Brown, C. J., concurring); *Horne v. Georgia So. & Fla. Ry.,* 5 Cir., 1970, 421 F.2d 975, 980 (Brown, C. J., concurring).

2.  Between April 1971 and June 1973.

3.  Brevard, Indian River, St. Lucie, Martin, and Palm Beach Counties, Florida.

4.  Buying fish "over-the-wall" describes the procedure whereby the dealer sends a truck and scale to a location other than his fish house, weighs in fish from waiting boats across the sea wall, and loads them into the truck for transport back to the fish house for cleaning, icing or freezing, and packing.

in the United States and in Puerto Rico. Generally, the dealers did not know in advance the exact prices they would receive for their fish until after they shipped them to market. Even when the retailers or wholesalers would quote a price to the dealer prior to shipment, they would often renege and offer a lower price once the dealer arrived with the fish.

If the supply of fish was particularly heavy, dealers sometimes froze a certain portion of the fish and stored them for resale at a later time, in the hope that prices would rise once the supply of fresh fish slacked off. This form of price speculation carried certain extra burdens—possible damage to the fish during the holding period, the normal market risks accompanying any form of price speculation, and the additional capital requirements necessary to build and maintain a freezing house and its equipment. Because of these extra burdens, the Pinders, as well as most other fish dealers in this area of Florida, did not have freezing equipment and the storage facilities necessary for keeping frozen fish for long periods of time. Hudgins, on the other hand, did have some freezing and storage equipment and facilities.

Also important to an understanding of this case is the method by which the fish prices were set. Commercial fishermen, the dealers, and the wholesalers and retailers all had a hand in setting the price. Wholesalers and retailers helped to set the maximum price by pricing dealers' fish at the markets. Because of the cost of transportation and storage, it may be presumed that the dealers had little leverage in this phase of the pricing operation, although they might improve their position somewhat by freezing a portion of their fish.

Because the dealer did not know the exact price at which he could sell his fresh fish until he had already shipped them to market,[5] he normally did not pay the commercial fishermen for their fish until after the price had been determined in the retail and wholesale markets. Instead, when the fishermen brought in their fish, the fish were sorted by species and weighed, and the amount and type of fish brought in by each fisherman was recorded. Then, if the fish were to be shipped on the fresh fish market, the fish would usually be gutted, iced down, and shipped on refrigerated trucks to market. After the dealer sold his fish to the wholesaler or retailer, he would calculate the price to pay the fishermen, after deducting his expenses and a profit. Several days after the fish were originally caught, the dealer would prepare a statement for each fisherman who brought fish to him, which stated the fisherman's name, the type of fish he brought in, the number of pounds per species, dockside price per pound, any deductions for advances, and total amount for all fish weighed in during the preceding week. Fishermen were then paid on Fridays or Saturdays, receiving a copy of this statement with their check.

If the fish were to be frozen for later resale, the fishermen would be paid on the same schedule, but the price paid would be a reflection of the anticipated price (less dealer expenses and profits) which the dealer hoped to sell the fish for during the off-season.

In spite of the apparent impotence of the fishermen in this pricing mechanism, they really possessed the power to set the *minimum* acceptable price, by their concerted refusal to fish when the price fell below a certain point.[6] Often, this minimum pricing decision was reached as a result of a consensus of fishermen through a fishermen's organization. Once the pricing decision was made, the fishermen would generally give the dealers advance warning of

---

5. We may presume, however, that the dealer generally had an approximate idea of the price he would receive prior to shipping his fresh fish to market.

6. Since the dealers had a rough idea of what the wholesalers and retailers would pay them, they were able to give the fishermen an approximate idea of the amount the dealers would be able to give the fishermen for their fish.

this minimum price.[7] Although the dealers tried to negotiate these prices, they were usually either forced to accept these minimum prices, or, if they found that they could not market the fish at the quoted minimum while still making a profit, they would tell the fishermen not to bring in any fish that day. This was known as "shutting down" the fishermen.

### Plaintiffs' Specific Allegations
### Cuttin' Bait

The specific facts surrounding this controversy between the Pinders and Hudgins were hotly contested, with each side putting on a variety of witnesses in support of its position. For the sake of clarity and for ease of discussion, we will organize these facts in three-groups—(i) the alleged takeover of the Pinders' Jupiter Marina fish house, (ii) the alleged marketing arrangement set up by Hudgins, and (iii) Hudgins' alleged boycott of the Pinders.

### Over-The-Wall

Through the testimony of John Tiff, the former manager of the Jupiter Marina, where the Pinders' fish house is located, plaintiff attempted to show that Hudgins tried to break the Pinders' lease. Tiff testified that Al Bowe, an employee of Hudgins, asked him in May 1971, "what kind of a lease Pinder had and if there was any way it could be broken so they could come in there * * *." Tiff also stated that Bowe said that "[i]f we could get a lease here we will build a fish house and guarantee so much a month." He also reported that Bowe stated that "[w]e want to put Mr. Pinder out of business if it is at all possible." Finally, Tiff testified that Bowe asked him if it was permissible for Hudgins to bring a truck into the marina to pick up fish over-the-wall. Tiff stated that he gave Bowe permission to do so. Tiff stated that it was never made clear who Bowe's "we" included, but that he, Tiff, assumed it included Hudgins, Bowe's employer.

To counteract the testimony of Tiff, defendant put Al Bowe on the stand. Bowe testified that he did ask Tiff whether there was any way he could get the Pinders' lease, but that he never said "we, Hudgins, wanted him [Pinder] out of there." Instead, Bowe testified that "I was planning to go into business there [in the Jupiter Marina] for myself and I wanted no part of it unless Pinder was completely off of that property." He further testified that his conversation with Tiff began with Tiff telling him that the owner lessor of the marina "was getting ready to throw him [Pinder] out and did I [Bowe] want * * * the lease?" Finally, Bowe testified that he did in fact open up a fish house for himself in Jupiter.

The plaintiffs next put on testimony showing that Hudgins came to Jupiter Marina, and took fish over-the-wall into a truck parked next to the marina. Dorothy Pinder, co-plaintiff, testified that Hudgins paid higher dockside prices than the Pinders during this time, so that many of the fishermen who had once fished for the Pinders began fishing for Hudgins.

Hudgins did not deny that he began this over-the-wall operation, but asserted that he did so at the request of some of the fishermen. He also noted that he was compelled to close down when the Pinders complained to municipal authorities that he was operating without a valid license. Hudgins testified that when he attempted to obtain a valid license, he was told by the authorities that they were not issuing any more licenses because the Pinders had the only available license in Jupiter. Thereupon, Hudgins returned to the West Palm Beach area from which he usually operated, but continued to buy fish at a higher dockside price than did Pinder. Upset at losing fishermen to Hudgins, the Pinders erected a sign at their Jupiter fish house that read: "Any fishermen that fishes for Hudgins cannot fish for Pinder."

7. Although this fishermen's organization set prices, individual fishermen also set their own prices, that might deviate from the group price.

In February 1972, the Pinders closed their Port Salerno fish house, and in April 1972, closed another business, leaving the Jupiter and Rivera fish houses as production points. Defendant claimed that this was done because the Pinders had wanted to get out of the fish business for years.

### The Marketing Arrangement

The Pinders testified that in 1972 Hudgins agreed to buy all the Pinders' production which would otherwise have gone to out-of-state markets for a minimum price of five to six cents per pound over the dockside price Hudgins paid his fishermen. According to the Pinders, the arrangement precluded them from selling directly to the New York market, but Hudgins would sell part of this production to the Pinders' former New York wholesale purchaser. The Pinders also testified that the arrangement precluded them from selling any fish to freezers.

The Pinders next testified that five fish dealers, other than Hudgins, were eventually brought into the arrangement. The Pinders explained that, during a meeting to discuss the details of this arrangement, Hudgins disclosed that his fishermen had told him that the minimum price they would accept for their fish for the coming winter run would be thirteen cents per pound until January 1973, when the price would go up one cent.[8]

Donald Stiller, another fish dealer who attended the dealers' meeting, testified that the dealers agreed that they could sell part[9] of their fish to Hudgins for a guaranteed minimum of five to six cents per pound over the dockside price that Hudgins paid his fishermen. Stiller, in addition to most of the other witnesses, described this agreement as covering only "surplus" fish— that is, those fish the dealers could not find a market for elsewhere. Stiller also testified that Hudgins did not guarantee that he would accept their fish. If Hudgins could not find a market for their fish on a certain day (or for any other reason) he was free to refuse to buy their fish that day. However, if he did buy their fish, he would pay them a minimum of five to six cents a pound over the dockside price he was paying his own fishermen. Finally, Stiller testified that the agreement provided that no dealer would sell directly to the freezers or other markets, unless the price they charged was two cents per pound higher than the price they received from Hudgins.

Hudgins testified that it cost him five to six cents per pound to clean and pack fresh fish. For that reason, he testified that he did agree to buy the dealers' surplus fish for five to six cents per pound over the dockside price he paid his own fishermen, as long as the dealers cleaned and packed the fish they sold him. This was a day-to-day arrangement, according to Hudgins, and he was free at all times to refuse to buy any fish. Furthermore, Hudgins denied that he set any restrictions on the participating dealers. According to his testimony, the dealers could sell to any market they wished, including the New York market, and they could sell for any price they wished. He thus denied that the "arrangement" involved any requirement that sales by dealers to other markets include two cents per pound mark-up. Hudgins also denied that he set the dockside price for any of the other dealers or, for that matter,

---

8. The details of the fishermen's meeting are generally undisputed. Hudgins was invited to attend a meeting of the fishermen's association. He attended, but specifically told them that he could not discuss prices, as that would be illegal. Thereupon, he sat down, and, as far as the record shows, did not speak again. However, after Hudgins sat down, an employee of his, Al Bowe, stood up and started giving *his* opinion of what reasonable fish prices should be. In addition to being an employee of Hudgins, Bowe was also a partner of Pinder, and, more importantly, was an independent fisherman

and a member of the association. Although plaintiff argues that Bowe was speaking as an agent of Hudgins at this meeting, the testimony shows that Bowe specifically stated that he was speaking for himself, presumably as an independent fisherman.

9. Dealers could still sell to in-state and out-of-state markets. Some of the witnesses testified, however, that the arrangement precluded the dealers from selling directly to the New York market. Others testified to the contrary.

that he set his own dockside price. Instead, the minimum price was dictated by what each dealer could agree on with his fishermen and still make a profit on the wholesale or retail markets. Hudgins also denied that he had asked or required the dealers to boycott other freezers.[10]

The upshot of Hudgins' testimony, which was corroborated by other witnesses in many respects,[11] is that the dealers did not have to sell Hudgins any fish if they did not want to, and indeed, they were free to sell as much of their fish as they wished to any market with no price or territorial restrictions on their sales. However, *if* they found that they were unable to sell their fish to other markets without losing money, and *if* they wanted to sell the fish to Hudgins, and *if* Hudgins wanted to buy them, then Hudgins would pay them five to six cents per pound over the dockside prices Hudgins paid his own fishermen, *if* the dealers would first clean and package the fish. Thus, according to Hudgins, he only agreed, on a day-to-day basis, and without placing any price or territorial restrictions on the dealers, to buy their surplus fish at approximately the same price it would cost him to buy and package the fish he bought from his own fishermen.

Granville Kelley, the partner of the Pinders during this period, testified that the Pinders in fact continued selling their fish to the New York market as well as other markets. Kelley testified that the critical factors determining where they would sell their fish during this period were "the need for cash, good cash flow, where you could obtain the best market and a lot of instances they would be sold here because we probably could not get them to New York at the right market."

Clint Pinder testified that the arrangement was generally unsatisfactory for him, because he was having trouble getting paid by Hudgins. Consequently, Pinder explained that he began selling his fish directly to the wholesale market in New York and terminated his participation in the agreement in February 1973.

### The Alleged Boycott

Pinder testified that, after he quit his participation in "the arrangement," Hudgins told Stiller, another dealer, not to sell fish to Pinder and not to let his boats sell fish to Pinder. Stiller, however, said that Hudgins never told him not to sell fish to Pinder.

During a meeting of fishermen, Crane announced that any fisherman who sold fish to Pinder could not sell to him. Crane admitted that he made such a statement, but that it was made to induce two fishermen who owed him money to bring him their fish, so that their debt to him could be worked off. He also stated that he was "mad when I said it and I thought it over and I told him I was sorry * * *."

About this time, Kelley, the Pinders' partner, pulled out of the partnership. Plaintiff emphasizes portions of Kelley's testimony which indicate Kelley left because he feared a price war. However, defendant emphasizes portions of Kelley's testimony which indicate Kelley left because Pinder refused to show him any records, because he could never determine whether the Pinders made a profit or a loss, because the Pinders failed to separate their retail and wholesale markets, thus hurting their business prospects, and because the behavior of the Pinders made it impossible for him to remain.[12]

---

10. Leon Kenney, president of Pinellas Seafood Company, a fish freezing company, testified that he bought fish to freeze from all the dealers who were parties to this "arrangement" during the entire period the alleged freezer boycott was in effect.

11. See, for example, the testimony of Bobby Crane, and of Donald Stiller, other fish dealers to whom Hudgins made his offer.

12. The poor state of the Pinders' bookkeeping was emphasized by defendant's damages expert, who noted the difficulty of proving exact damages from the records of the Pinders. It was also revealed implicitly by the testimony of plaintiffs' damages expert, who was forced to reconstruct plaintiffs' records from the original fishermen's statements and invoices. Mr. Kelley's testimony about the Pinders' poor busi-

The spring 1973 run of kingfish was particularly heavy. The Pinders' dockside price fell off as the landings increased, as did two other dealers, although all fell at different rates. However, there was testimony that Hudgins' dockside price increased during this period, although this might be explained by Hudgins' freezing capabilities. Pinder testified that other dealers (Crane, in particular) instructed their boats not to fish for Pinder during this period, although several fishermen testified that they were always free to fish for any dealer. Hudgins denied that he ever told his fishermen or other dealers to boycott Pinder.

At one point during the spring run, Pinders froze some of their fish on their own account, because wholesale buyers were paying less than the Pinders had paid dockside. The Pinders had to borrow money to freeze the fish, and they claimed that the costs of freezing and storage eventually resulted in a financial loss. Defendant maintains that the Pinders were only doing what most of the other dealers, including Hudgins, did from time to time—speculating on frozen fish. Defendant points to testimony of Dorothy Pinder, tending to show that the Pinders could never determine whether they lost or made money as the result of freezing the fish in 1973. Consequently, the Pinders had to abandon their claim for damages because of sales from the freezer.

*The Expert Witnesses*

In order to explain the significance of these facts, both plaintiffs and defendant put on expert witnesses. The plaintiffs' witness was Frederick J. Smith, a marine economist who had studied the Florida seafood industry. Dr. Smith outlined guidelines for a submarket in the seafood industry,[13] defined the geographical area between Cape Canaveral and West Palm Beach as a submarket, and explained a structural model of the seafood industry in the relevant submarket. His opinions were based on dockside prices generally, and on the Pinders' and Hudgins' prices specifically.

Dr. Smith described a "normal" situation in the submarket, but noticed that price fluctuations reflected on the charts he had prepared were not those normally associated with supply and demand, for his studies indicated a significant increase in price without a shortage of supply. Dr. Smith also testified that a comparison of Hudgins' dockside prices during 1972–73 with New York wholesale market returns showed major changes in dockside prices without parallel changes on the wholesale markets. He testified that the heavy spring 1973 run of kingfish was met by an abnormal upward pricing.[14]

Dr. Smith testified that the top five firms in this submarket controlled more than 75 percent of the supply. From this fact, Dr.

---

ness practices (excerpted in note 16, *infra*) is also revealing on this point.

**13.** Dr. Smith testified that the primary means of separating a market into submarkets was by the geographic concentration of landings of certain types of fish. He testified that he would also look to the availability and concentration of transportation in the seafood industry, the concentration of labor input in fish filleting, and the source of funds for financing sales by dealers to wholesale or retail markets.

**14.** However, on cross-examination the following exchange took place between defense counsel and Dr. Smith.

Q. All right, sir. So assume that * * * Hudgins knows that every year between September and Thanksgiving there is going to be a dry spell of fish and you get 90 cents sometimes for a pound of fish, King Fish, and assume that he plans to freeze these fish and does freeze these fish. Is it unusual for him to pay his fishermen 60 cents a pound thereby realizing only 30 cents a pound himself when he ultimately gets rid of them?

A. Your term unusual is not quite clear to me. You were referring from one—

Q. Is that an abnormal, what do you call it, what do you call that market situation.

A. It would be a, if he could anticipate a price in the fall it would be, this would be normal to try to obtain a supply to meet that.

&ast; &ast; &ast; &ast; &ast; &ast;

A. Now, if this takes a higher price then that is one means of acquiring it. There are other means of acquiring supply.

Smith characterized the industry and the relevant submarket as "concentrated" and explained supply/demand abnormalities as resulting from "dominant firm" activity.

Dr. Smith then used a hypothetical in which he characterized the behavior of Hudgins as characteristic of a dominant firm in a concentrated industry faced with a challenge, exercising monopoly power to maintain dominance. He described the agreement among dealers to be an exercise of monopoly power through collusive agreement to control the supply of fish to freezers and an exercise of power by the dominant firm to control supply to out-of-state markets, thereby influencing prices.

Dr. Smith described Hudgins' higher dockside prices during the heavy spring 1973 run as a price war to exert sanctions against the Pinders. The fact that Hudgins' price was unnecessarily high (foregoing available substantial profits) was characterized as the assertion of monopoly power to regain dominance of the relevant submarket.[15]

Dr. Smith noted that the determination of market prices is normally outside the power of a single firm, unless that firm exercises monopoly power, which he defined as a power to set price and exclude competition in the relevant submarket. In sum, in Dr. Smith's opinion, Hudgins had exercised monopoly power.

Plaintiffs next introduced the testimony of an accountant as to the financial losses suffered by the Pinders. Based on fishermen's statements, sales returns from the New York markets, sales returns from Florida markets, sales returns from the Pinders to Hudgins, freezer invoices, and income tax returns, the accountant determined that the Pinders had lost $63,685.00.

To rebut the testimony given by the plaintiffs' expert witnesses, defendant relied upon the following evidence. First Hudgins testified that of the dealers on the east coast of Florida, one produced twice the amount of fish he did, two produced five to ten percent more than him, and the Pinders produced about the same amount as he did. Second, the Pinders' own expert admitted under cross-examination that plaintiffs' behavior in buying fish from other markets was also characteristic of a dominant firm. Finally, plaintiffs' expert testified that, *if* there were no territorial restrictions in the dealer arrangement, *if* dealers were free to sell whatever amount of fish they wished to Hudgins, *if* the arrangement simply provided that Hudgins would pay five or six cents per pound over the dockside price he paid his own fishermen, and *if* Hudgins himself was not obligated to accept all fish, then Hudgins' behavior would not be indicative of a monopoly.

Because of the poor bookkeeping of the plaintiffs, their accountant witness was forced to depend on historical data to give an opinion as to their possible financial loss. Even so, he could not assert positively that these losses were in any way caused by defendant's activities. Defendant claims that any losses sustained by the plaintiffs were simply the result of their poor business practices.[16]

---

15. See note 13, *supra*.

16. Granville Kelley, the former partner of the Pinders, testified at some length as to the poor business practices of the Pinders:

Q. To your knowledge, while you were there were any records kept of any kind, of any postings?

A. I am, not to my knowledge, no.

Q. Well, how did they determine in fact there was a profit or there was a loss?

A. Well, this confounds me because I felt that they had made a profit during the King Fish run. It could never be determined. Can I say that Mr. and Mrs. Pinder were used to operating a family operation and I consider them, excuse my expression, a hip-pocket operation which is a business whereby it is run by the family. If at the end of the year they have an extra thousand dollars in the bank and they have run through the year and they pay their expenses, they made a thousand dollars profit.

They were not organized. I do not say that they could not be organized. They were not organized to where they could enter into a partnership arrangement or business arrangement whereby, say, records would be kept in specifics and what-have-you. They did not operate that type of business.

Defendant put on his own expert witness, Dr. David Georgoff, a professor of marketing at Florida Atlantic University. Dr. Georgoff stated that to create a monopoly situation there must be a single or dominant seller of a product or service for which there is no adequate substitute. Here, Dr. Georgoff explained that other fish substitutes existed for kingfish and other food product substitutes for fish in general. Furthermore, he testified that the market was not sufficiently concentrated for a monopoly to exist. Finally, although Dr. Georgoff never defined precisely whether he believed that the east cost of Florida, the state of Florida, or the entire United States was the smallest relevant economic market in the food fish industry, his testimony made it amply clear that he disagreed with Dr. Smith that the five county area defined in the plaintiffs' complaint was a realistic economic submarket.

### The Standard Of Review

In *Boeing Co. v. Shipman*, 5 Cir., 1969, 411 F.2d 365 (*en banc*), this Court formulated the "proper standard in federal court to test the sufficiency of the evidence for submission of a case to the jury, in connection with motions for directed verdict and for judgment notwithstanding the verdict * * *." *Id.* at 367. We held that:

On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidence—not just that evidence which supports the non-mover's case—but in the light and with all reasonable inferences

most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury. A mere scintilla of evidence is insufficient to present a question for the jury. The motions for directed verdict and judgment n. o. v. should not be decided by which side has the better of the case, nor should they be granted only when there is a complete absence of probative facts to support a jury verdict. There must be a conflict in substantial evidence to create a jury question. However, it is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses.

*Id.* at 374–75 (footnote omitted).

Since plaintiffs appeal only from the District Court's denial of their motion for judgment n. o. v., the test set forth in *Boeing* must be our guide.

### Application Of The Standard

The Pinders attempted to show that the defendant had formed a conspiracy in restraint of interstate trade and commerce in

* * * * * *

Q. I want you to tell me, sir, everything that you can recall that lead to your decision to leave.

* * * * * *

A. * * * There was no records to know whether we were making money. I did not like the idea of how things were being prescribed.

* * * I felt that it was a family operation and should be kept in the family operation, the way they were operating it, and it would be difficult to determine, it was not a business arrangement in my opinion, it was not good business.

* * * * * *

A. Well, the thing that upset me and number one the record keeping was bad. * * * The way billing was done there was a loose arrangement. You take and deliver two boxes to Seafood City, there wouldn't be any sign, and it was left to memory that you got to pick up another two boxes or you got to get an exchange of a box or something else because there was a difference in price, and there was no real records kept.

Q. You are talking about delivering fish to somebody that was to pay you money?

A. Well, in some instances there were records kept, but in most instances, in some instances there were no records kept.

violation of Section One of the Sherman Act, 15 U.S.C.A. § 1, and that the defendant had attempted to monopolize the fish food industry along the lower east coast of Florida, in violation of Section Two of the Sherman Act, 15 U.S.C.A. § 2, all to damage of the plaintiffs.

■ Section One of the Sherman Act prohibits "[e]very contract, combination * * *, or conspiracy, in restraint of trade * * *." Although this section generally prohibits only unreasonable restraints on competition, certain restraints are considered to be *per se* unreasonable. These include price fixing, *United States v. Socony-Vacuum Oil Co.*, 1939, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129; division of markets, *Addyston Pipe & Steel Co. v. United States*, 1899, 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136; group boycotts, *Fashion Originators' Guild v. FTC*, 1940, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949; and tying arrangements, *International Salt Co. v. United States*, 1947, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20. These activities, "because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *Northern Pacific Ry. v. United States*, 1958, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545, 549.

Plaintiffs argue that the evidence proves beyond doubt that the defendant instigated a combination of fish dealers for the purpose of fixing prices, boycotting the Pinders, boycotting freezer markets, allocating supply by agreeing to a common market among them, and reciprocal dealing, all of which are *per se* violations of the Sherman Act. We disagree. The evidence concerning the "agreement" was strongly conflict-ing. Viewed in the light of all reasonable inferences most favorable to Hudgins, substantial evidence tends to show that the "agreement" was nothing more than an offer by Hudgins to buy the surplus fish of other dealers at his own dockside price, plus his cost of packaging.

■ Furthermore, viewing the evidence as we are required to do under *Boeing*, this "agreement" did not require the dealers to sell to Hudgins if they did not wish to do so; it did not require Hudgins to accept any fish; and it imposed no price or territorial restrictions on the dealers. Finally, there is substantial evidence tending to show that Hudgins never instituted a freezer boycott or any other boycott against Pinder. Using the *Boeing* standard, we conclude that the plaintiffs have failed to show that the trial court erred in refusing to grant their motion for judgment n. o. v. on the Section One issue. The evidence supports the jury's general verdict in favor of the defendant, with its implied finding that defendant's actions were not, *per se* or otherwise, in violation of Section One.

■ Section Two of the Sherman Act provides that "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce" shall be guilty of an offense. In *United States v. Grinnell Corp.*, 1966, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778, 786, the Supreme Court stated that the "offense of monopoly under § 2 of the Sherman Act has two elements; (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." Defining the relevant market,[17] the threshold require-

17. In *United States v. E. I. duPont de Nemours & Co.*, 1956, 351 U.S. 377, 395, 76 S.Ct. 994, 1007, 100 L.Ed. 1264, 1280–81, the Supreme Court stated the test for determining the relevant market:

In considering what is the relevant market for determining the control of price and competition, no more definite rule can be de-clared than that commodities reasonably interchangeable by consumers for the same purposes make up that 'part of the trade or commerce,' monopolization of which may be illegal.

Factors such as functional interchangeability, responsiveness of the sales of one product to the price changes of the other, and degree of

ment under Section Two, is essentially a matter of resolving factual issues. *See Heatransfer Corp. v. Volkswagenwerk, A.G.*, 5 Cir., 1977, 553 F.2d 964, 979–81; *Sulmeyer v. Coca Cola Co.*, 5 Cir., 1975, 515 F.2d 835, 849.

■ As in the Section One issue, the evidence concerning the Section Two issue is strongly conflicting. Of primary importance for our consideration here is the fact that the parties' expert witnesses disagreed dramatically on whether the five county area defined in the plaintiffs' complaint constituted a relevant submarket, necessary for a Section Two violation. These experts also disagreed as to whether Hudgins was a "dominant firm" or had monopoly power in the submarket (assuming this area was a submarket), as evidenced by the ability to fix prices or to control the dealers to whom fishermen sold their catch. Viewing all the evidence and the inferences in the light most favorable to Hudgins, we conclude that substantial evidence opposes the plaintiffs' motions as to the Section Two issue. Reasonable and fair-minded men in the exercise of their impartial judgment could reach different conclusions. Under the *Boeing* standard the plaintiffs have failed to establish to a certainty justifying judgment n. o. v. that the five county area defined in their complaint is a relevant submarket or that Hudgins possessed monopoly power in any other relevant market. Accordingly, since the plaintiffs have not met their burden under *Boeing* of overcoming the adverse jury verdict, we affirm the judgment of the trial court in all respects.

AFFIRMED.

competition from the potential substitute are all relevant to the market inquiry. *See, e. g.,*

*Yoder Bros., Inc. v. California-Florida Plant Corp.*, 5 Cir., 1976, 537 F.2d 1347.