**Hugh V. SMITH and Sybil M. Smith, Plaintiffs,**

v.

**CHASE MANHATTAN CORPORATION, a corporation, Housing Investment Corporation of Florida, a wholly owned subsidiary of Chase Manhattan Corporation, a corporation, CMRCC, Inc., a corporation, Defendants.**

Civ. A. No. 77–55–N.

United States District Court, M. D. Alabama, N. D.

Oct. 13, 1978.

Frank O. Burge, Jr., Birmingham, Ala., and Gatewood A. Walden, Montgomery, Ala., for plaintiffs.

Thomas W. Thagard, Jr., Smith, Bowman, Thagard, Crook & Culpepper, Montgomery, Ala., for defendant Housing Investment Corp., of Florida.

Samuel H. Franklin and Macbeth Wagnon, Jr., Birmingham, Ala., for defendants Chase Manhattan Corp. and CMRCC, Inc.

## MEMORANDUM

JOHNSON, Chief Judge.

This civil action claiming breach of a contract to lend money and fraudulent representations was initiated by Hugh V. Smith, Jr., and his wife, Sybil M. Smith (Smith), against Housing Investment Corporation of Florida (HIC), Chase Manhattan Realty Capital Corporation, Inc., and Chase Manhattan Corporation.[1] The case was tried to a jury and on May 19, 1978, the jury returned a verdict in favor of plaintiffs and against HIC in the amount of $7,250,-000. Judgment thereon was entered by this Court on June 6, 1978.[2] On May 26, 1978, defendant HIC pursuant to Rules 50 and 59 of the Federal Rules of Civil Procedure filed its motion for judgment notwithstanding the verdict and in the alternative for a new trial. This motion is now submitted.

Considering the evidence in the light most favorable to the plaintiffs, this Court finds and concludes that there was no substantial evidence to justify or sustain the jury verdict. A meticulous review of the evidence in this case impresses the Court that there was no substantial evidence to justify submitting any of plaintiffs' claims against HIC to the jury.[3]

---

1. At the close of plaintiffs' evidence, a motion for directed verdict was granted in favor of Chase Manhattan Realty Capital Corporation, Inc., and Chase Manhattan Corporation. The case went to the jury on the claims made by the plaintiffs against Housing Investment Corporation of Florida.

2. At the close of the evidence on May 19, 1978, and without objection by plaintiffs, this Court directed a verdict in favor of HIC and against the plaintiffs with respect to HIC's counterclaim in the amount of $6,656,569.48. Judgment thereon was entered on May 31, 1978.

3. This Court, in following its usual practice, submitted the case to the jury even though the Court was of the tentative conclusion at the time that the motion for directed verdict made by HIC at the close of all of the evidence should be granted. *Fratta v. Grace Line, Inc.*, 139 F.2d 743 (2d Cir. 1943); *Van Pendley v. Fidelity & Casualty Co. of New York*, 459 F.2d 251 (5th Cir. 1972); *Malone & Hogan Hospital Foundation v. Boston Ins. Co.*, 378 F.2d 362 (5th Cir. 1967); *Davis v. United States*, 378 F.Supp. 579 (N.D. Tex. 1974).

The loan transactions between Smith and HIC related to the development and construction by Hugh V. Smith, Jr., of a real estate project known as the Rolling Hills Golf and Racquet Club comprised of an eighteen-hole golf course, clubhouse with related facilities, water and sewage facilities, and a two-hundred lot subdivision with streets and roads located several miles out of Montgomery, Alabama. Smith purchased the Rolling Hills property in December, 1972, with the grantor retaining a purchase money mortgage, and in October, 1974, Smith's outstanding indebtedness to the grantor was approximately $600,000. In September, 1974, Smith obtained from Mr. Asa Groves, president of HIC, a written mortgage loan commitment, and in October, 1974, Smith entered into a written mortgage loan commitment agreement with HIC whereby, subject to the terms and conditions thereof, HIC agreed to make a first mortgage loan to Smith in the amount of $2,600,000. The written loan commitment, among its numerous terms, required Smith to satisfy certain conditions prior to the actual loan closing. As is usual, one of the specific conditions was that Smith and his wife were to execute all necessary loan documents required by HIC. On February 5, 1975, Smith and HIC entered into a new written mortgage loan agreement whereby, subject to the terms and conditions thereof, the amount of the first mortgage loan was increased from $2,600,000 to $2,900,000. That written loan commitment was again approved on behalf of HIC by Groves. Among other things, this agreement provided that:

"In no event will the loan funds disbursed be greater than the amount [$2,900,000] of the actual hard and soft cost necessary to develop the security property, as approved by HIC, whichever is the lesser amount."

The loan closing was held in February, 1975, at which time Smith and his wife executed the promissory note payable to HIC in the amount of $2,900,000, the mort-

gage in favor of HIC pertaining to the Rolling Hills project, and a building and construction loan agreement.

In addition to his status as owner of the Rolling Hills project, Smith, who was and is an attorney at law, assumed the responsibilities normally undertaken by a general contractor in a project of such magnitude. Smith had initiated certain site work prior to the loan closing and, for that reason, an initial disbursement of funds was made by HIC to Smith at the closing in February, 1975, for work already in place as well as for the usual closing costs. After this loan closing, Smith periodically submitted requests for disbursements on "draw requests" forms that were utilized by HIC.

As early as March, 1975, it became apparent to Smith that the portions of the $2,900,000 loan allocated for construction were inadequate and insufficient to complete construction of the project.[4] In July, 1975, the amount of the cost overruns on the project approached $500,000 and negotiations began concerning an increase in the loan. By the end of July, 1975, the size of the cost overruns approached $1,100,000 and HIC and Smith were engaged in extensive discussions concerning the reasons for such overruns and the feasibility of continuing the project. By August, 1975, the cost overruns on the Rolling Hills project approached $1,500,000. After considerable negotiations between Smith and HIC, it was determined around the end of October, 1975, that the revised total cost for the Rolling Hills project was $5,500,000. This determination resulted in a request by Smith for an increase in the loan of $2,600,-000.

In January, 1976, HIC issued a written mortgage loan commitment to Smith increasing the loan from $2,900,000 to $5,500,-000. As a condition of the increase in the loan, HIC required Smith to provide additional security beyond the original mortgage covering the Rolling Hills project. At this point, Smith elected not to accept the written commitment in the amount of

4. There was substantial evidence that Smith knew prior to the original loan closing that the

estimated construction costs that he submitted HIC were substantially understated.

$5,500,000, but rather advised HIC by letter dated February 3, 1976, that an additional $350,000 over and above the $5,500,000 would be required to fully complete the project. After receiving this letter in February, 1976, James Carr, the HIC loan administrator assigned to Smith's loan, and Alan Hathaway, a senior officer of HIC, met with Smith in Montgomery, Alabama, for the purpose of determining the amount of the increased loan commitment necessary fully to complete the project. The evidence reflected that Carr and Hathaway had been authorized by Grove to execute a written commitment with Smith in whatever amount was required to assure the full completion of the Rolling Hills project. During these negotiations, Smith was, upon several occasions, advised that this was the last time the loan would be increased. As a result of these negotiations in February, 1976, HIC issued an amendment to its written mortgage loan commitment increasing the loan from $5,500,000 to $5,965,000. As before, certain terms and conditions were required to be met prior to a closing of the increased loan. While these negotiations were going on concerning this latest increase in the loan, HIC and Smith entered into another mortgage loan commitment dated August 26, 1975, whereby, subject to the terms and conditions thereof, HIC agreed to make a first mortgage loan to Smith in the amount of $540,000 for the construction of ten houses on lots in the Rolling Hills project. By its terms, the loan which HIC agreed to make to Smith pursuant to the $540,000 construction loan on the ten houses was to be (and was) cross defaulted with the $5,965,000 development loan.

In April, 1976, the loan closing—on the development project—was held and Smith executed two promissory notes to HIC in the amounts of $2,900,000 and $165,000, an agreement amending the earlier mortgage dated February 13, 1975, and a building and construction loan agreement. In addition, other agreements were executed by Smith whereby he mortgaged and/or pledged to HIC certain assets as additional collateral and whereby HIC would receive a percentage of the "gross sell out" of certain portions of the project. In May, 1976, a loan closing was held pursuant to the mortgage loan commitment for the construction of the ten houses and at that time Smith executed a promissory note payable to HIC in the amount of $540,000, a mortgage in favor of HIC on the ten houses to be constructed, and a building and construction loan agreement.

In June, 1976, James Carr, the representative of HIC who had responsibility for the administration of the Smith loan, advised Smith that certain management changes had occurred at HIC and that Smith should find ways to make large pay downs on his loan as the new management desired such repayments where possible; however, the draw request submitted by Smith in June, 1976, was funded in its entirety by HIC. In July, 1976, Smith submitted his monthly draw request but HIC elected to disburse only a portion of the funds requested. This action was taken because, as the evidence in this case reflected without conflict, inspection reports obtained from the company that was performing the engineering inspections on the project indicated further cost overruns despite the recent increase in the loan. HIC advised Smith in writing of the reasons for this partial funding. In August, 1976, the draw request by Smith was not funded in its entirety since reports from the engineering company doing the inspection again reflected cost overrun problems on the Rolling Hills project. In September, 1976, Carr approved a disbursement to Smith in the amount of $102,068 which was his last action with respect to the Smith loan prior to his departure as an officer of HIC. Upon Carr's departure from HIC, the Smith loans were assigned to Tom Vincent and Lynn Boling. Vincent and Boling began discussions once again with Smith with respect to cost overruns on the project. The cost overruns at this time approached approximately $200,000. This was as of September 2, 1976. In fact, by letter dated September 21, 1976, Smith advised HIC that the cost overruns at the Rolling Hills project were again of the mag-

nitude of approximately $400,000 or more. Subsequent to receiving that letter, no disbursements were made directly from HIC to Smith although certain disbursements were made by HIC directly to subcontractors in order to complete essential work on the project.

In February, 1977, Smith filed this civil action against HIC, CMRCC, and CMC. The basis for his action was, as stated earlier: HIC's alleged breach (1) of its written contracts, (2) of certain alleged oral agreements between Smith and HIC whereby HIC would lend to Smith "whatever amounts were required to fund cost overruns and to complete the project," and (3) of certain oral agreements between Smith and HIC whereby HIC would release its security interest in certain assets as long as such assets were used for the furtherance of the Rolling Hills project; and HIC's alleged fraudulent misrepresentations to Smith that disbursements exceeding the amount set forth in the written documents would be made. Smith claimed to have suffered actual damages as the result of the alleged breaches of the contract or as a result of his reliance upon certain alleged fraudulent conduct by HIC. In addition, Smith claimed punitive damages as a result of the alleged fraud.

█ The evidence is without conflict that the transactions between Smith and HIC were the product of extensive negotiations and discussions involving large sums of money between sophisticated businessmen, one of whom was a lawyer. There is no question but that there were oral discussions, negotiations and agreements between Smith and the representatives of HIC. However, these discussions, negotiations, and agreements transpired prior to the loan closings in each instance. The culmination of the negotiations and discussions in each instance was the execution by the parties of formal written documents such as mortgage loan commitments, promissory notes, mortgages, and subsequent amendments to the mortgages and building and construction loan agreements. This Court finds that, as a matter of law, any oral discussions, nego-

tiations, representations or agreements had or made prior to the execution of the written documents were merged or incorporated into the final written agreement. *League v. Griffin*, 347 So.2d 1332 (Ala. 1977); *W. T. Rawleigh Co. v. Cone*, 232 Ala. 127, 167 So. 274 (1936). Each of the written mortgage loan commitments signed by Smith specifically provided as follows:

> "Borrower agrees that this agreement is the sole agreement with HIC concerning this transaction, and no oral representation or agreements have been given by HIC to borrower."

█ In all instances in this lawsuit, the loan documents and written loan commitments are free of any ambiguity with respect to the amount of money which HIC agreed to lend Smith and with respect to all events surrounding the entire transaction. In such instances, the law is clear that the loan documents speak for themselves and are to be given their full meaning. *Flowers v. Flowers*, 334 So.2d 856 (Ala. 1976); *Birmingham Trust National Bank v. Midfield Park, Inc.*, 295 Ala. 136, 325 So.2d 133 (1976). Smith's testimony that he did not fully read these loan documents does not change the force of these legal principles. *Colburn v. Mid-State Homes, Inc.*, 289 Ala. 255, 266 So.2d 865 (1972). Thus, it is clear that the amount of the final development loan to which HIC committed itself was limited to $5,965,000 of which $4,658,753 was disbursed to Smith for direct construction costs, the remainder being retained by HIC for payment of origination fees and interest.

█ The evidence in this case is clear and there is no substantial evidence to the contrary that Smith defaulted and that HIC was not obligated either legally or morally to make any further advances and was entitled, as it did, to declare the entire indebtedness immediately due and payable. These defaults included diversion by Smith of amounts approximating $300,000 to projects and uses other than the development and construction of the Rolling Hills project. For instance, beginning in April, 1975, and through June, 1977, Smith con-

veyed to purchasers by warranty deed Rolling Hills' lots that were mortgaged to HIC without securing a release from HIC of its mortgage. Further, with respect to at least four lot sales during 1975, Smith failed to remit to HIC the agreed portions of the sale prices or other considerations received from purchasers. Also, at the time of the increased loan closing, Smith misrepresented his ownership of the mortgaged property in that he represented ownership of 200 lots when he had already conveyed four of these lots to others. Furthermore and most importantly, Smith allowed liens to be placed against the security property and failed to have the liens removed within the required period of time. These were material breaches or defaults by Smith that fully justified HIC in its decision to default the development loan in the amount of $5,965,-000. Since the $540,000 house construction loan was cross-defaulted, HIC was justified in refusing to fund further sums under that loan regardless of whether separate defaults existed.

■ Smith's contentions, upon which the jury verdict is apparently based, that the written agreements were modified by certain oral agreements, to the extent that HIC agreed to lend whatever sums might be required in order to fund cost overruns and in order to fund the Rolling Hills project to completion, are absolutely without evidentiary support that can afford a legal basis to sustain the jury verdict. This is to say, the oral agreements that Smith claims were made on behalf of HIC by Armstrong and/or Carr can have no force since neither, according to the undisputed evidence in this case, had authority from HIC to bind HIC to such agreements. The contention that an apparent agency authority existed is without legal or factual substance. *Assured Growth Corporation v. Tomberlin*, 334 So.2d 918 (Ala.Civ.App. 1976); *Johnson v. Shenandoah Life Insurance Company*, 291 Ala. 389, 281 So.2d 636 (1973); *Ray E. Loper Lumber Company v. Windham*, 291 Ala. 428, 282 So.2d 256 (1973).

■ Further, there is no evidence of any waiver or action that would constitute estoppel of HIC regarding its rights and remedies. In the first place, Smith was at all times during these transactions a practicing attorney specializing in real estate matters. In each of the written mortgage loan commitments the following language appeared:

"Should HIC waive any of its options or rights under this commitment, such waivers shall not constitute a waiver of any of HIC's rights or options under the remaining terms or conditions of this commitment."

Further, the mortgage dated February 13, 1975, specifically provided:

". . . no delay or omission of [HIC] to exercise any right or power accruing upon any event or default herein, or in the notes secured hereby, shall impair any such right or power, or shall be construed to be a waiver of any such event or default or any acquiescence therein; ". . ." (Section 2.05)

"That any failure by [HIC] to insist upon the strict performance by [Smith] of any of the terms and provisions hereof shall not be deemed to be a waiver of any of the terms and provisions hereof, and [HIC], notwithstanding any such failure, shall have the right thereafter to insist upon the strict performance by [Smith] of any and all of the terms of this mortgage to be performed by [Smith]." (Section 3.02)

Additionally, each of the promissory notes executed by Smith contained this language:

". . . if any of the conditions and requirements in said mortgage are not complied with, the entire principal sum, at the option of the holder hereof, shall become due and payable. Failure to exercise this option shall not constitute a waiver of the right to exercise the same in the event of any subsequent default."

Further, the building and construction loan agreements dated February 19, 1975, and April 7, 1976, contained this language:

"No delay or failure of [HIC] or the holder of the note in exercising any right, power, or privilege hereunder shall affect

such right, power, or privilege hereunder, nor shall any single or partial exercise thereof or any abandonment or discontinuance of steps to enforce such a right, power, or privilege preclude any further exercise thereof or of any other right, power, or privilege . . . Any waiver, permit, consent or approval of any kind or character on the part of [HIC] of any breach or default under this agreement or any waiver on the part of any party hereto of any provision or condition of this agreement must be in writing and shall be effective only to the extent of such writing specifically set forth . . ." (Section 7.05)

Smith is not helped by his contention that HIC's failure to exercise its rights after learning of some of his defaults constituted a waiver of subsequent defaults. *Semmes Nurseries, Inc. v. McDade,* 288 Ala. 523, 263 So.2d 127 (1972); *Barry v. Welch,* 248 Ala. 167, 26 So.2d 872 (1946).

Smith's fraud claims and the evidence introduced attempting to support these claims were focused on the contentions that whatever cost overruns were encountered by Smith in completing the Rolling Hills project in a "first-class manner" would be funded by HIC,[5] and that the "additional assets" pledged by Smith when the loan was enlarged to $5,965,000 would be returned if the Smiths needed them to complete the Rolling Hills project. Smith testified that in reliance on these representations he continued construction work on the project and incurred debts to various subcontractors, suppliers, and temporary lenders. As the evidence reflects, HIC subsequently refused to further fund the project in accordance with Smith's expectations and did not release any of the "additional assets." Plaintiff testified that this action resulted in liens and lawsuits by other creditors and damage to his credit standing and damage to the reputation of the project. The only testimony presented to support this fraudulent misrepresentation theory came from Asa Groves, Alan Hathaway, James Carr, and the plaintiff Hugh Smith.

Groves testified that in October, 1975, after a discussion with Hathaway and Carr and after a physical inspection of the project, he, Groves, decided that despite a substantial cost overrun above the lien outstanding commitment for a loan of $2,900,000, HIC should "stick with" Smith and provide funds to complete the project because this would improve the prospects for ultimate repayment to HIC. After negotiation, including several warnings to Smith to be sure that all future costs were provided for because this would be his last opportunity to increase the loan, an amendment to the written mortgage loan commitment was eventually executed by HIC and by Smith whereby the loan amount was increased to $5,965,000. Groves also testified that he did not make any commitment to lend Smith more than this amount and that he did not know of anyone else who could or did make such a commitment. Groves testified most emphatically that he never made any open end commitment to Smith and that he never authorized Carr or Hathaway to make any such commitment.

Hathaway did negotiate with Smith upon several occasions, resulting in February, 1976, in an amendment to the written mortgage loan commitment increasing the loan amount to $5,965,000. This document was executed by Hathaway and Smith. Hathaway testified, and the other evidence including that of Smith verified, that Smith was cautioned prior to the execution of the $5,965,000 commitment to make certain that all costs required to complete the project had been included. Hathaway did not testify that any further or different authority was given to him by his supervisors at HIC that would have enabled him to increase the loan by any additional amount. Hathaway did testify that sometime in the summer of 1976 he made a statement to Smith to the effect that HIC intended to "ride that horse with him until the project was complete." This statement is the extent of any representation attributed by Smith to Hathaway.

---

**5.** This is the gist of what Smith claims the oral agreements were.

Carr, who at one time had primary responsibility for administering Smith's loans, testified that after the loan was increased to $5,965,000 in April, 1976, he did not make any further commitments to Smith with respect to increases in the loan amount. Carr did testify, however, that on several occasions and in the summer of 1976 when Smith was again reporting cost overruns in the range of $200,000 to $300,000, he told Smith that he would get together with him and would "work it out" or "would try to work it out." On this point, Smith testified that Carr on several occasions told him, "don't worry," and that "he would take care of you as soon as we can." However, the evidence is without dispute that such statements were made in the context of Carr explaining that he was, because of the press of other business, unable to meet with Smith right away concerning the cost overruns Smith was reporting.

█ The "promissory in nature" statements do not even purport to contain representation concerning any past or existing state of facts. Such statements cannot possibly constitute misrepresentation under the law. The only basis upon which they could support a finding of fraud would be a showing that at the time the promises of future action were made the promisor did not have any intention of carrying out the promise as made and instead had an actual intent to deceive. *Shepherd v. Kendrick*, 236 Ala. 289, 181 So. 782 (1938). The concept of "legal fraud" resulting from a misrepresentation is limited to statements concerning past or existing facts and has no application to statements looking to future events. On this point, even Smith testified that he was satisfied that Groves and Carr intended to do everything that they stated to him they would do. *Old Southern Life Insurance Company v. Woodall*, 295 Ala. 235, 326 So.2d 726 (1976); *Birmingham Broadcasting Company v. Bell*, 259 Ala. 656, 68 So.2d 314 (1953). Thus, there is no evidence in the case that would justify this jury verdict based upon the contention of fraud on the part of HIC or any of HIC's representatives.

█ In summary, the evidence presented in this case reflected that the plaintiffs received approximately five and one-half million dollars of HIC's money which they used, among other purposes, to construct the Rolling Hills project. The jury award in this case of $7,250,000 has the effect of canceling Smith's entire debt to HIC and of giving all of the improvements on the Rolling Hills project, including the golf course, the clubhouse, swimming pool, and all of the other improvements, to the plaintiffs without any mortgage indebtedness. The jury verdict would even require further payment by HIC to the plaintiffs in the amount of $594,000. Such a result would be a gross miscarriage of justice, would give the plaintiffs a windfall, and would inflict punishment on HIC that cannot be tolerated by the law. Thus, for the first time in twenty-three years as a trial judge on the federal bench, this Court feels compelled to enter an order in this case setting aside the jury verdict for plaintiffs and entering a judgment in favor of the defendant. In doing so, the Court has considered all of the evidence in this case, not just the evidence that supports HIC's contention, but in the light, and with all reasonable inferences, most favorable to Smith. After so considering the evidence, it is apparent that the facts and inferences point so strongly and overwhelmingly in favor of HIC that this Court finds and concludes that reasonable jurors could not reach and return a verdict to the contrary. *Samuels v. Empresa Lineas Maritimas Argentinas*, 573 F.2d 884 (5th Cir. 1978); *Pinder v. Hudgins Fish Co., Inc.*, 570 F.2d 1209 (5th Cir. 1978); *Boeing Co. v. Shipman*, 411 F.2d 365 (5th Cir. 1969) (en banc).

A formal order will be entered accordingly.